## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JOE A. KANNIKAL,** | ) | **Case No. 3:12-cv-220** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE KIM R. GIBSON** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **WILLIAM P. BARR,** | ) | |
| **Attorney General,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### MEMORANDUM OPINION

**I.    Introduction**

This case arises from the Bureau of Prisons' ("BOP") alleged discrimination against Plaintiff in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") while he worked as a physician's assistant ("PA") at the Federal Correctional Institution in Loretto, Pennsylvania ("FCI Loretto"). Pending before the Court is Defendant William P. Barr's Motion for Summary Judgment. (ECF No. 120.) The Motion is fully briefed (ECF Nos. 121, 131) and ripe for disposition. For the reasons that follow, the Court **GRANTS** Defendant's Motion.

**II.    Jurisdiction and Venue**

This Court has subject-matter jurisdiction because Plaintiff's Title VII claims arise under federal law. 28 U.S.C. § 1331. Venue is proper because the case was transferred to the Western District of Pennsylvania, where a substantial part of the events giving rise to Plaintiff's claims occurred. 28 U.S.C. § 1391(b)(2), § 1404(a).

## III. Factual Background

The following facts are undisputed unless otherwise noted.[1]

### A. Plaintiff's Initial Employment with BOP and the EEOC Proceeding

Plaintiff first began working as a PA at FCI Loretto in May of 1988. (ECF No. 127 ¶ 1.) About six months later, BOP granted Plaintiff a hardship transfer to its Correctional Center in Miami, Florida so that he could be near his family and study for his medical boards. (*Id.* ¶ 2.) In June of 1990, Plaintiff requested a three-month leave of absence to study for the medical examination for foreign medical graduates; when BOP denied his request for a leave of absence, he resigned from the BOP. (*Id.* ¶ 3.) In 1992, Plaintiff applied for a vacant PA position at FCI Loretto. (*Id.* ¶ 4.) According to Plaintiff, Jeff Trimbath, the Assistant Health Administrator at FCI Loretto, prevented him from being hired because of discriminatory animus. (*Id.* ¶ 5.) Mr. Trimbath denied any and all allegations of discriminatory animus. (*Id.* ¶ 6.) Plaintiff filed a discrimination complaint with the Equal Employment Opportunity Commission ("EEOC") and, in a bench decision issued on May 11, 1995, the EEOC found in favor of Plaintiff and ordered that Plaintiff be reinstated as a PA, with back pay and benefits. (*Id.* ¶¶ 7–8.)

On January 20, 1998, Plaintiff was reinstated as a PA at FCI Loretto. (*Id.* ¶ 9.) Plaintiff practiced under the supervision of Clinical Director Dr. Daniel Leonard, Health Services Administrator William Schnake, and Mr. Trimbath. (*Id.* ¶ 10.) Mr. Trimbath supervised Plaintiff's time and attendance, but did not supervise Plaintiff's clinical work or performance; Dr.

---

[1] The Court derives these facts from a combination of Defendant's Statement of Material Facts (ECF No. 122), Plaintiff's Response to Movant's Concise Statement of Undisputed Facts and Statement of Additional Facts that Are at Issue ("New Matter") (ECF No. 127), and Defendant's Response to Plaintiff's "New Matter" (ECF No. 134).

Leonard had that responsibility. (*Id.* ¶¶ 54-55.) Mr. Trimbath had no interaction with Plaintiff involving discipline with respect to Plaintiff's clinical skills, evaluations, or revocation of medical privileges. (*Id.* ¶ 56.)

Plaintiff began at FCI Loretto on February 3, 1998. (*Id.* ¶ 11.) Before Plaintiff received his medical privileges, FCI Loretto had to verify his medical credentials. (*Id.* ¶ 19.) Medical privileges allow a PA to diagnose and treat patients and are granted by the Clinical Director of the Institution, Dr. Leonard. (*Id.* ¶ 20.) Plaintiff submitted the paperwork necessary to review his application for privileges on February 4, 1998 and, in compliance with BOP policy, Dr. Leonard granted Plaintiff temporary privileges for a 90-day probationary period on February 20, 1998. (*Id.* ¶¶ 23-24.) The warden of FCI Loretto, James Franco, approved Plaintiff's temporary medical privileges on March 5, 1998. (*Id.* ¶ 17.)

## B. Plaintiff's Time Off and Leave

On April 6, 1998, approximately two months after he started working, Plaintiff took extended sick leave until June 1, 1998.[2] (*Id.* ¶ 28.) On April 6, 1998, Plaintiff called in sick and told Mr. Schnake that he would be at his home in Miami, Florida until Memorial Day.[3] (*Id.* ¶ 29.) On Monday June 8, 1998, Plaintiff called in sick, stating that he had food poisoning, and did not return to work until June 9, 1998. (*Id.* ¶ 31.) In addition, on June 10, 1998, Plaintiff requested extended annual leave from July 12, 1998, through August 1, 1998, to visit his ill mother in India.

---

[2] Defendant asserts that Plaintiff took additional time off during his employment, which Plaintiff disputes. (*See* ECF No. 127 ¶¶ 27, 30, 33-34.) Defendant asserts that over Plaintiff's period of employment from January 20, 1998 to September 3, 1999, Plaintiff was absent from work for a total of approximately nine months. (ECF No. 121 at 18 n.3.)

[3] Plaintiff asserts that he provided Defendant with numerous notes from doctors stating that he needed leave to deal with his depression. (ECF No. 127 (New Matter) ¶¶ 27-32.)

-3-

(*Id.* ¶ 32.) Between February 3, 1998, and June 29, 1998, Plaintiff had used 80 hours of annual leave and 291 hours of sick leave. (*Id.* ¶ 66.)

Plaintiff left for India to visit his ill mother on July 10, 1998, and returned to work on August 24, 1998. (*Id.* ¶¶ 75, 93.) Then on September 28, 1998, Plaintiff again took extended sick leave to his home in Miami and did not return to work until December 15, 1998. (*Id.* ¶¶ 95–96.) The following year, Plaintiff took extended sick leave from March 22, 1999, through May 14, 1999, and leave again from May 17, 1999, through May 21, 1999, to attend a psychiatric conference. (*Id.* ¶¶ 115–16.)

## C. Plaintiff's Work Performance and Discipline

During the 90-day probationary period, Dr. Leonard expressed his concern about Plaintiff's performance to Mr. Schnake and Mr. Trimbath, which involved the way he was prescribing medications, his examinations, and the way he was writing up his entries. (*Id.* ¶¶ 45–46.) Dr. Leonard told Mr. Schnake that he had concerns about the treatment Plaintiff was rendering and that he wanted to fire Plaintiff because he felt Plaintiff's care was inappropriate and not up to FCI Loretto's standards. (*Id.* ¶ 48.)

On June 10, 1998, Dr. Leonard issued Plaintiff a three-page memorandum informing Plaintiff that his performance of medical duties was unacceptable, and Dr. Leonard provided specific examples of poor patient care. (*Id.* ¶ 49.) On the same date, Dr. Leonard placed Plaintiff on a Performance Improvement Plan ("PIP"). (*Id.* ¶ 50.) During the 30-day PIP period, Dr. Leonard prepared several memoranda about his concerns with Plaintiff's unacceptable medical performance. (*Id.* ¶ 57.) Dr. Leonard wrote that he did not believe that Plaintiff was using his "opportunity to improve period" to his full advantage. (*Id.* ¶ 69.)

On June 29, 1998, Mr. Schnake informed Plaintiff that his excessive use of sick leave was affecting his performance, in that his absence was not allowing him to train with other staff and to gain the necessary experience to function as a PA. (*Id.* ¶ 65.) On July 6, 1998, Mr. Trimbath issued Plaintiff a letter stating that his pattern of using sick leave "was unacceptable." (*Id.* ¶ 73.) Mr. Trimbath noted in the letter that Plaintiff had used sick leave "in conjunction with [his] weekends" three times in the past month to visit his family in Miami and the letter ordered Plaintiff to provide medical documentation before using sick leave for the next three months. (*Id.* ¶ 74.)

On July 9, 1998, Dr. Leonard and Mr. Trimbath met with Plaintiff to discuss his progress under the PIP. (*Id.* ¶ 78.) At the conclusion of the PIP period, which ended on July 10, 1998, Dr. Leonard refused to reinstate Plaintiff's medical privileges. (*Id.* ¶ 82.)

On July 11, 1998, Plaintiff wrote to Warden Franco complaining about his unacceptable rating and claimed that his supervisors were retaliating against him and subjecting him to a hostile work environment. (*Id.* ¶ 83.) Warden Franco responded to Plaintiff's letter, stating that he had reviewed the record and felt that Dr. Leonard's actions did not constitute harassment or reprisal, and that he had been given an opportunity to improve his performance. (*Id.* ¶ 88.)

When Plaintiff returned to work on August 24, 1998 after his sick leave, he was given non-medical duties because Dr. Leonard had withdrawn his medical privileges. (*Id.* ¶ 94.) Upon his return to work after taking extended sick leave from September 28, 1998, to December 15, 1998, Plaintiff performed non-medical duties until March of 1999, because Dr. Leonard had not reinstated his medical privileges. (*Id.* ¶¶ 95–97.)

On September 18, 1998, Warden Franco requested that a Focus Review Team assess Dr. Leonard's determination to deny clinical privileges to Plaintiff. (*Id.* ¶ 98.) The Focus Review Team concluded that Plaintiff had made serious errors in five of the ten cases they had reviewed. (*Id.* ¶ 105.) Dr. Jae Shim, the Clinical Director of BOP's facility in Allenwood, Pennsylvania and member of the Focus Review Team, opined that, based upon the review of the medical records and his conversation with Plaintiff, he "agree[d] with Dr. Leonard's decision to revoke [Plaintiff's] privileges due to medical incompetence." (*Id.* ¶ 106.)

On December 21, 1998, Mr. Trimbath issued Plaintiff another leave abuse letter noting that he had "used over 150 hours of sick leave during the past three months" and had not always provided medical excuses for his absences. (*Id.* ¶ 108.) On December 28, 1998, Plaintiff was interviewed by the Special Investigative Agent at FCI Loretto for misconduct for failing to follow procedure with regard to his sick leave. (*Id.* ¶ 109.)

### D. Plaintiff's Reassignment and Termination

On February 2, 1999, Mr. Schnake issued Plaintiff a letter proposing to terminate his employment. (*Id.* ¶ 111.) The reasons given for Plaintiff's proposed termination were: (1) the removal of his medical privileges, (2) failure to improve while on the PIP, (3) failure to follow instructions concerning his use of sick leave by not providing medical excuses, and (4) his time spent AWOL because he failed to provide documentation for some of his absences. (*Id.* ¶ 112.)

On March 3, 1999, Warden Bobby Shearin, who had replaced Warden Franco, issued a memo to Plaintiff assigning him full time to the Inmate Systems Management ("ISM") branch. (*Id.* ¶ 113.) During his reassignment, Plaintiff's title, pay, and grade all remained the same. (*Id.*

¶ 114.) Upon his return to work on May 24, 1999 after extended sick leave, he performed non-medical duties until June 2, 1999. (*Id.* ¶ 117.)

On June 2, 1999, Warden Shearin issued Plaintiff a Notice of Removal, informing Plaintiff that he was being removed for: (1) his loss of medical privileges, (2) his failure to follow instructions, and (3) his absences without leave. (*Id.* ¶ 118.) On that same date, Plaintiff and BOP officials entered into a Last Chance Settlement Agreement whereby BOP agreed not to remove Plaintiff for a period of 60 days if Plaintiff improved his performance. (*Id.* ¶ 120.) The agreement provided that Plaintiff would be required to participate in specific classes and review specific materials. (*Id.* ¶ 121.) Pursuant to the agreement, Mr. Trimbath was officially removed as Plaintiff's immediate supervisor and Mr. Schnake became his supervisor. (*Id.* ¶ 122.) The agreement also created a plan wherein Dr. Leonard and Mr. Schnake would provide Plaintiff with close supervision, including observing and training Plaintiff while he conducted mock medical examinations of inmates. (*Id.* ¶ 123.) Finally, the agreement provided that if Plaintiff's performance did not improve within sixty days he would be terminated. (*Id.* ¶ 124.)

Between June 16, 1999, and August 12, 1999, Dr. Leonard and Mr. Schnake met regularly with Plaintiff to observe mock examinations and review medical assessments and assignments. (*Id.* ¶ 129.) On June 16, 1999, Plaintiff complained that, during one of his mock interviews, Mr. Schnake got angry and stated "BS discrimination." (*Id.* ¶ 125.) Mr. Schnake admits that he made the statement, but denies that the statement was made to harass or discriminate.[4] (*Id.* ¶ 126.) On July 12, 1999, Plaintiff wrote to Warden Shearin, complaining about a "hostile, abusive, retaliatory

---

[4] Plaintiff asserts that, at some point, Mr. Schnake also made racially charged comments about Plaintiff behind closed doors. (ECF No. 134 ¶ 39.)

working environment and the harassment and intimidation at the Health Service Department."

(*Id.* ¶ 133.) On July 19, 1999, Warden Shearin responded to Plaintiff's letter and explained, among other things, that he had failed to provide specific instances of "hostile, abusive, retaliatory working environment and the harassment and intimidation at the Health Service Department."

(*Id.* ¶ 136.)

On August 12, 1999, Dr. Leonard concluded that he would "not give [Plaintiff] privileges under [his] medical license to care for patients at FCI Loretto," based upon his observations of Plaintiff during the Last Chance period. (*Id.* ¶ 142.) Dr. Leonard found that Plaintiff's medical misjudgments included, but were not limited to: failure to ask about symptoms, failure to perform systematic examinations, failure to accurately describe disease etiology, failure to properly document his examinations, failure to properly perform the auscultation of a patient's aortic valve, failure to properly obtain a patient's blood pressure, inability to identify risk factors for certain medical conditions, inability to identify various causes of certain medical conditions, lack of knowledge in reading EKGs, and incomplete understanding of what parameters are contained in laboratory studies that he ordered. (*Id.* ¶ 138.)

On August 26, 1999, Warden Shearin informed Plaintiff that his employment would be terminated on September 3, 1999, due to his failure to demonstrate that he could safely care for the patients he was treating at FCI Loretto. (*Id.* ¶ 143.) In the termination letter, Warden Shearin highlighted the various medical errors that Plaintiff had made, and noted that Dr. Leonard had determined that Plaintiff did not possess the requisite medical knowledge and was not competent enough to be granted medical privileges under Dr. Leonard's license. (*Id.* ¶ 144.) Plaintiff's employment was terminated on September 3, 1999. (*Id.* ¶ 145.) Warden Shearin testified that

Plaintiff's termination was not based upon his race, color, national origin, or his prior EEO activity.[5] (*Id.* ¶ 147.)

## IV. Procedural Background

On March 28, 2012, Plaintiff filed suit in the United States District Court for the District of Columbia against Defendant, the United States Department of Justice ("DOJ"), and the BOP. (ECF No. 1). Defendant, the DOJ, and the BOP subsequently moved to dismiss or, in the alternative, to transfer the case. (ECF No. 3). Plaintiff filed an Amended Complaint on June 25, 2012, naming Defendant as the sole defendant. (ECF No. 6.) In the Amended Complaint, Plaintiff alleges discrimination on the basis of race (Count I), national origin (Count II), and retaliation (Count III), each in violation of Title VII.

On July 9, 2012, Defendant moved to dismiss the Amended Complaint, or in the alternative, to transfer the case to the Western District of Pennsylvania. (ECF No. 9). Judge Gladys Kessler granted the motion to transfer the case to this Court. (ECF No. 16). On January 30, 2013, Defendant filed a motion to dismiss the Amended Complaint, (ECF No. 26), which the Court granted on March 10, 2014. (ECF No. 56.) Plaintiff appealed the dismissal. (ECF No. 57.)

After appeal, the case was remanded to this Court by the Third Circuit. (ECF Nos. 59, 60.) On November 6, 2015, Defendant answered (ECF No. 78), and moved for summary judgment on

---

[5] Other staff at FCI Loretto also testified that they did not believe Plaintiff was discriminated against regarding any issues leading up to Plaintiff's termination based upon race, his color, his national origin, age or in reprisal for prior EEO activity. (*Id.* ¶ 158.) This staff includes Mark Sewak, a Senior Officer Specialist and Union President (*id.* ¶¶ 152–56), Daniel Gallagher, a Recreation Specialist at FCI Loretto (*id.* ¶¶ 159–60), PA Michael Condor (*id.* ¶¶ 169–70), PA Scott Middlekauff (*id.* ¶¶ 171–74), PA Maria Angeles (ECF No. 134 ¶ 39), Mr. Schnake (ECF No. 127 ¶¶ 177–80), and Human Resources Manager Don Carabardi (*id.* ¶ 187).

February 12, 2019. (ECF No. 120.) Plaintiff responded in opposition on May 1, 2019. (ECF No. 127.)

## V. Legal Standard

This Court will grant summary judgment "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Melrose, Inc. v. Pittsburgh*, 613 F.3d 380, 387 (3d Cir. 2010) (quoting *Ruehl v. Viacom, Inc.*, 500 F.3d 375, 380 n.6 (3d Cir. 2007)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). There is a genuine issue of fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005). Material facts are those that affect the outcome of the trial under governing law. *Anderson*, 477 U.S. at 248. The Court's role is "not to weigh the evidence or to determine the truth of the matter, but only to determine if the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party." *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 581 (3d Cir. 2009). In deciding a summary judgment motion, this Court "'must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor.'" *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 278 (3d Cir. 2000) (quoting *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994)).

The moving party bears the initial responsibility of stating the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If the moving party meets this burden, the party opposing summary judgment "may not rest upon the mere allegations or denials" of the pleading, but "must set forth specific facts showing that there is a genuine issue for trial." *Saldana v. Kmart*

*Corp.,* 260 F.3d 228, 232 (3d Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475

U.S. 574, 587 n.11 (1986)). "For an issue to be genuine, the nonmovant needs to supply more than

a scintilla of evidence in support of its position—there must be sufficient evidence (not mere

allegations) for a reasonable jury to find for the nonmovant." *Coolspring Stone Supply v. Am. States*

*Life Ins. Co.,* 10 F.3d 144, 148 (3d Cir. 1993); *see also Podobnik v. U.S. Postal Serv.,* 409 F.3d 584, 594

(3d Cir. 2005) (noting that a party opposing summary judgment "must present more than just

bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue").

## VI. Discussion

### A. The Parties' Arguments

Defendant asserts that Plaintiff cannot convince a reasonable jury that discrimination was

a motivating or determinative cause of the adverse employment actions BOP took against him.

(ECF No. 121 at 20.) Defendant argues that BOP terminated Plaintiff because: (1) he had lost his

medical privileges by failing to demonstrate medical competence and endangering the safety of

the patients he was responsible for, (2) he had failed to follow instructions concerning his use of

sick leave, and (3) he had multiple absences without leave. *(Id.)*

Defendant contends that there is ample evidence in the record supporting Dr. Leonard's

opinion that Plaintiff's medical performance was substandard and substantiating Dr. Leonard's

concerns about the quality of health care that Plaintiff was providing to FCI Loretto inmates. *(Id.*

at 4.) In addition to his clinical deficiencies, Plaintiff's excessive absences contributed to his

performance problems because he was unable to train with other staff to gain the necessary

experience to be a successful PA. *(Id.* at 5.) Because Plaintiff's performance did not improve

during the 30-day PIP period, Dr. Leonard decided not to reinstate Plaintiff's medical privileges

and felt that Plaintiff should be terminated. (*Id.* at 4–6.) Without medical privileges, Plaintiff was unable to perform the medical duties of a PA. (*Id.* at 6.) During the Last Chance period, Plaintiff continued to make medical misjudgments and his performance did not improve. (*Id.*)

Defendant argues that Plaintiff cannot credibly rebut the criticisms of his performance, and that there is no persuasive evidence that Plaintiff's medical skills improved during either the PIP period or the Last Chance period. (*Id.* at 7.) Dr. Leonard and his staff gave more attention to Plaintiff not with the purpose of discrimination or retaliation, but to work with him in an attempt to improve his performance. (*Id.*) BOP personnel who observed Dr. Leonard and Plaintiff's interactions, union representatives, and other co-workers all testified that they did not observe Dr. Leonard harass Plaintiff or discriminate against him. (*Id.* at 9–11.)

Defendant further asserts that the reasons given for Plaintiff's termination were not pretextual because the record supports the proffered rationales for terminating Plaintiff. (*Id.* at 18–19.) Any supervisor would be legitimately concerned about an employee who took sick leave in conjunction with weekends, missed months of work, and who failed to properly provide medical documentation, notwithstanding multiple direct instructions to do so. (*Id.* at 19.)

Defendant asserts that Mr. Trimbath has denied allegations that he used racially derogatory language towards Plaintiff. (*Id.* at 15.) Even if Mr. Trimbath did use such language, none of the language relates to the present case, as the alleged statements were made years prior to Plaintiff's reinstatement in 1998. (*Id.*) Plaintiff has pointed to no credible or objective evidence in the record that establishes that Mr. Trimbath used the alleged derogatory language subsequent to Plaintiff's reinstatement in 1998. (*Id.* at 17.) Moreover, Mr. Trimbath played no role in the decision to remove Plaintiff's medical privileges and was not involved with the decision to place

Plaintiff into a Last Chance Settlement Agreement or the decision to terminate Plaintiff's employment. (*Id.* at 16.) Mr. Trimbath's letters to Plaintiff regarding his absences did not wrongfully single him out for harassment, as no other health unit employee used as much leave or had as many problems timely documenting leave as did Plaintiff. (*Id.* at 18.)

Defendant asserts that Mr. Schnake's comment about "BS Discrimination" was not made to harass or discriminate. (*Id.* at 19.) The statement is nothing more than an isolated offensive remark that was made on only one day. (*Id.*) Plaintiff's filing of a complaint about this remark with Warden Shearin that same day demonstrates that it did not chill Plaintiff's EEO rights. (*Id.* at 19–20.) Defendant asserts that there is no evidence that Mr. Schnake took any adverse action against Plaintiff and no co-worker witnessed any discrimination or retaliation by him. (*Id.* at 20.)

Plaintiff opposes the Motion by asserting that there are numerous genuine issues of material fact that must be tried. (ECF No. 131 at 1.) Plaintiff asserts that Defendant's contention that Plaintiff was incompetent is not credible because Plaintiff had excellent performance ratings as a PA before 1992. (*Id.* at 6.) Plaintiff also took time off to combat depression exacerbated by the treatment he experienced at FCI Loretto, which is protected under the Family and Medical Leave Act ("FMLA"). (*Id.*)

Plaintiff argues that Defendant terminated him due to his prior EEO activity and retaliated against him after he was reinstated in 1998. (*Id.*) Mr. Trimbath—the same person who made derogatory comments about Plaintiff's race—twice wrote up Plaintiff for absenteeism, but Plaintiff had already submitted doctor's letters explaining that he needed to take the leave. (*Id.* at 8.) Plaintiff submitted sufficient records to place Defendant on notice that he was taking FMLA leave, and the FMLA establishes that employers may not use the taking of FMLA leave as a

negative factor in disciplinary actions. (*Id.* at 10–11.) Plaintiff's absences in September and December of 1998 were noted as part of the reason Mr. Schnake proposed Plaintiff's termination. (*Id.* at 12.) However, the FMLA prohibits Defendant from using Plaintiff's absenteeism as a legitimate reason for Plaintiff's termination.[6] (*Id.* at 14.)

Plaintiff asserts that he was subjected to disparate treatment[7] because he was the only PA, over a number of years, to have been subject to a PIP, shadowed, required to watch instructional videos, and terminated. (*Id.* at 14–15.) Plaintiff states that it is "reasonable to presume" that, given the nature of the work, Plaintiff is not the only PA who was considered to have had performance deficiencies. (*Id.* at 16.) Plaintiff argues that two other PAs, Mr. Burk and Mr. Catiller,[8] had problems with patient care but were not put on PIPs. (*Id.*)

Plaintiff next asserts that Mr. Schnake's comments and conduct are evidence of frustration with Plaintiff's filing of EEO claims and his conduct "evinces a retaliatory motive more than anything else." (*Id.* at 23.) His comments also show that he had discriminatory racial animus towards Plaintiff. (*Id.* at 24.)

Plaintiff argues that the memos written by Dr. Leonard and Mr. Schnake are evidence of pretext. (*Id.* at 18–21.) In Dr. Leonard's disciplinary action memos, Defendant failed to reference

---

[6] Plaintiff asserts that all of the reasons for which Plaintiff was terminated are therefore discredited because "[a]s per Third Circuit caselaw, discrediting one reason answered by an employer for an adverse action serves to discredit the other asserted reasons." (*Id.* at 9.) Plaintiff provides no authority for this assertion and the Court accordingly provides it no weight. Because Plaintiff does not raise claims under the FMLA, whether he was entitled to FMLA leave is not material to this case.

[7] It is unclear from Plaintiff's brief which claim this argument is supporting. Plaintiff asserts that "evidence of disparate treatment . . . is not needed for a claim of retaliation," but makes no mention of race, color, or national origin discrimination. (*Id.* at 14.)

[8] Plaintiff points out that Mr. Burk was white, but does not specify Mr. Catiller's race. (*Id.* at 16.) The Court will assume that he is also white because Plaintiff concludes that this was "circumstantial evidence which shows Defendant subjected Plaintiff to disparate treatment due to his national origin and/or color." (*Id.*)

any objective guidelines, rules, or regulations that were allegedly violated by Plaintiff. (*Id.* at 17.) Dr. Leonard's disciplinary actions against Plaintiff were based only his subjective opinion of Plaintiff's performance and Dr. Leonard wrote the memos "in order to create a paper trail." (*Id.*) Plaintiff rebutted all six complaints from Dr. Leonard's June 10, 1998, writeup. (*Id.* at 18–19.) Dr. Leonard never considered Plaintiff's rebuttal and his opinions of Plaintiff's care were entirely subjective. (*Id.* at 18.) Similarly, none of Mr. Schnake's memos contained any citation to any alleged violation of any of Defendant's policies, practices or procedures, and Plaintiff never received the memos. (*Id.* at 20.) These memos contained "contrived" criticism of Plaintiff's performance. (*Id.* at 22–23.) Moreover, the Last Chance agreement did not provide Plaintiff with an opportunity to show improvement because Defendant violated the terms set out in the agreement by assessing Plaintiff's performance only on the basis of Plaintiff's interaction with 14 patients instead of the promised 60 patients during his 60-day assessment period. (*Id.* at 17.)

## B. Defendant Is Entitled to Judgment as a Matter of Law on Plaintiff's Disparate Treatment Claim

Plaintiff asserts that he was subject to discrimination because of his race, color, and national origin.[9] Title VII makes it unlawful for an employer to discriminate against an individual with respect to his employment on the basis of the individual's race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a). It is undisputed that during the period of time relevant to this case, the BOP was an "employer" subject to Title VII's provisions, and Plaintiff was an "employee" entitled to statutory protection from race-based discrimination. § 2000e(b), (f).

---

[9] Because the alleged discriminatory acts put forth by Plaintiff touch on all three of these bases, the Court will analyze all three together, rather than separately.

Since this is an employment discrimination case in which Plaintiff has presented no "direct evidence" of discrimination, the Supreme Court's framework in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981), provide the formulation for allocating the requisite burdens of proof and production for purposes of the instant motion for summary judgment.[10] In an employment discrimination case of this kind, the plaintiff must first establish a *prima facie* case of illegal discrimination. *McDonnell Douglas*, 411 U.S. at 802. If the plaintiff establishes a *prima facie* case of discrimination, the defendant must articulate legitimate, nondiscriminatory reasons for treating the plaintiff in an adverse manner. *Id.* at 802–03. If the defendant articulates legitimate, nondiscriminatory reasons for the plaintiff's adverse treatment, the plaintiff must demonstrate that the reasons given by the defendant for such treatment are merely a pretext for unlawful employment discrimination. *Id.* at 804–05.

## 1. Plaintiff Has Failed to Establish a *Prima Facie* Case of Disparate Treatment

The plaintiff's burden of establishing a *prima facie* case of disparate treatment is not onerous. *Burdine*, 450 U.S. at 253. To establish *a prima facie* case of discrimination, the plaintiff must show that: (1) he is a member of a protected class; (2) he was subject to an adverse employment action; and (3) that the adverse employment action occurred under circumstances

---

[10] The *McDonnell Douglas-Burdine* burden-shifting framework does not apply in an employment discrimination case in which a plaintiff presents "direct evidence" of discrimination. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002). "Direct evidence" of discrimination is evidence that is "so revealing of discriminatory animus that it is not necessary to rely on any presumption" from the plaintiff's *prima facie* case to shift the applicable burden of production to the defendant. *Starceski v. Westinghouse Electric Corp.*, 54 F.3d 1089, 1096 n.4 (3d Cir. 1995). The evidence presented in this case does not constitute "direct evidence" of discrimination.

that give rise to an inference of unlawful discrimination. *Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 410–11 (3d Cir. 1999).[11]

Here, it is undisputed that Plaintiff is a member of a protected class because he is Indian and from India. It is also undisputed that the adverse employment actions at issue include denial of medical privileges, demotion from PA to correctional officer, and termination. Therefore, the Court must only determine whether Plaintiff has shown that these actions give rise to an inference of unlawful discrimination.

At the *prima facie* stage, the "central focus" is on whether an employer has treated an employee less favorably than others on the basis of an illicit discriminatory criterion. *Howard v. Blalock Electric Service, Inc.*, 742 F. Supp. 2d 681, 701–02 (W.D. Pa. 2010). However, an inference of race-based discrimination cannot arise simply from an employee's subjective belief that his race somehow influenced the challenged employment action. *Id.* at 702. Instead, a plaintiff can establish a *prima facie* case of illegal discrimination by showing that he has received less favorable treatment than similarly situated employees who did not share his or her statutorily-protected trait, *Pivirotto v. Innovative Systems, Inc.*, 191 F.3d 344, 352–57 (3d Cir. 1999), or by showing that his race, color, or national origin was a "motivating factor" in the challenged employment action. *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167, 174 (2009) (citing 42 U.S.C. § 2000e-2(m)).

---

[11] The Court has determined that these three elements are the ones relevant to the present case. *See id.* at 411 (noting that the specific elements of a *prima facie* discrimination case generally "depend on the facts of the particular case" before the court and "cannot be established on a one-size-fits-all basis."); *see also Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 358 (1977) ("The importance of *McDonnell Douglas* lies, not in its specification of the discrete elements of proof there required, but in its recognition of the general principle that any Title VII plaintiff must carry the initial burden of offering evidence adequate to create an inference that an employment decision was based on a discriminatory criterion illegal under the Act.")

Here, Plaintiff has not produced any evidence that his race or national origin was a motivating factor in his demotion or termination. Although the record may contain evidence that Mr. Trimbath and Mr. Schnake at one point each made disparaging remarks about Plaintiff's race, the record is devoid of evidence permitting an inference that Defendant terminated Plaintiff because of his race. Even assuming animus on Mr. Trimbath's or Mr. Schnake's part, they played no role in the challenged adverse employment actions taken against Plaintiff. It is undisputed that Dr. Leonard made the decision to deny Plaintiff's medical privileges, effectively "demoting" Plaintiff to a correctional officer, not Mr. Trimbath or Mr. Schnake. Additionally, the Focus Review Team, composed of medical staff who did not work at FCI Loretto, agreed with Dr. Leonard's decision to revoke Plaintiff's medical privileges. It is also undisputed that Warden Shearin, not Mr. Trimbath or Mr. Schnake, was the one who decided to terminate Plaintiff. Warden Shearin relied on Dr. Leonard's memos in making his decision, and Plaintiff has failed to show that Mr. Trimbath or Mr. Schnake had any role in his decision to terminate Plaintiff. Plaintiff has made no allegation that either Warden Shearin or Dr. Leonard had any racial animus towards him.

Plaintiff attempts to show that because he was treated less favorably than two white employees, Mr. Burk and Mr. Catiller, he was subject to unlawful discrimination. However, Plaintiff's allegation goes no further than this. Plaintiff has failed to show that these men made the same medical errors that he did. Plaintiff asks this Court to "presume" that they made errors. Although Plaintiff can rely on inferences to establish a *prima facie* case, Plaintiff "cannot repeatedly pile one inference upon another in order to establish a *prima facie* case of discrimination." *Howard*, 742 F. Supp. 2d at 703. The Court cannot simply presume that all PAs

at FCI Loretto were similarly situated to Plaintiff and made similar medical mistakes; the Court requires some evidence that this was the case. To prove discrimination, Plaintiff must demonstrate that these men were similarly situated and received more favorable treatment than Plaintiff. Plaintiff has shown neither.

Plaintiff has failed to show that his race, color, or national origin played any role in his termination. His subjective belief is not enough. Multiple witnesses testified that they did not believe Plaintiff's race had any role in the disciplinary actions taken against him. *See supra* note 5. Plaintiff has been unable to name anyone who can support his contention that the staff at FCI Loretto treated him differently because of his race, color, or national origin. Ms. Angles, the PA who heard Mr. Schnake's allegedly offensive comments, testified that she did not believe that Dr. Leonard, Mr. Schnake, or Mr. Trimbath discriminated against Plaintiff on the basis of race, color, or national origin. (ECF No. 134 ¶ 39.) Plaintiff has not shown that his race, color, or national origin was a "motivating factor" in the denial of his medical privileges, assignment to non-medical tasks, or termination.

Accordingly, Plaintiff has failed to establish a *prima facie* case for his disparate treatment claims under Title VII.

### 2. Defendant Has Put Forth Evidence that Permits a Jury to Find that Plaintiff Was Terminated for Legitimate, Non-discriminatory Reasons

Even assuming that Plaintiff has put forth enough evidence to make out a *prima facie* case, Defendant has put forth evidence that indicates the adverse employment actions were taken for non-discriminatory reasons. If the plaintiff establishes a *prima facie* case of discrimination, the burden of production shifts to the defendant to rebut the presumption of discrimination through

the introduction of admissible evidence indicating that the challenged employment action was taken for legitimate, nondiscriminatory reasons. *Burdine*, 450 U.S. at 254–55. To sustain this burden, "[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons." *Id.* at 254. The inquiry concerning whether the defendant has met its burden of production "can involve no credibility assessment," since "the burden-of-production determination necessarily *precedes* the credibility-assessment stage." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993) (emphasis in original). The defendant satisfies its burden of production, and rebuts the plaintiff's *prima facie* showing of discrimination, simply by introducing admissible evidence that, *if taken as true*, would *permit* a finding that the challenged employment action was taken for legitimate, nondiscriminatory reasons. *Id.* (emphasis in original).

First, Defendant has put forth evidence that shows that Plaintiff's medical privileges were revoked because of his medical misjudgments. Dr. Leonard's memo states that Plaintiff's medical misjudgments included, but were not limited to: failure to ask about symptoms, failure to perform systematic examinations, failure to accurately describe disease etiology, failure to properly document his examinations, failure to properly perform the auscultation of a patient's aortic valve, repeated failure to properly obtain a patient's blood pressure, inability to identify various causes of certain medical conditions, inability to identify risk factors for certain medical conditions, lack of knowledge in the reading of EKGs, and incomplete understanding of what parameters are contained in laboratory studies that he ordered.

Second, Defendant has put forth evidence that shows that Plaintiff was assigned non-medical tasks because Dr. Leonard revoked his medical privileges and never reinstated them. Without medical privileges, he was unable to perform medical tasks.

Third, Defendant has put forth evidence that shows that Plaintiff was terminated due to his failure to demonstrate that he could safely care for the patients he was treating at FCI Loretto. The termination letter highlights the various medical errors that Plaintiff had made and noted that the Clinical Director, Dr. Leonard, had determined that Plaintiff did not possess the requisite medical knowledge and was not competent enough to be granted medical privileges under Dr. Leonard's license.

Therefore, Defendant has satisfied its burden of production to show that Plaintiff's revocation of medical privileges, demotion, and termination were each taken for non-discriminatory reasons.

### 3. Plaintiff Cannot Show that Defendant's Reasons for Termination Are Pretextual

After the defendant meets its burden of production, the burden returns to the plaintiff to produce evidence from which a reasonable jury could find that the proffered reasons were pretextual. *Burdine*, 450 U.S. at 255–56. In order to establish that the defendant is liable for illegal employment discrimination, the plaintiff must ultimately convince the trier of fact that a discriminatory animus was the *real reason* for the adverse employment action at issue. *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994). Liability cannot be established upon a jury's mere *disbelief* of the defendant's proffered reasons for an adverse employment action, but rather upon the jury's *affirmative belief* of the plaintiff's contention that the action was taken on the basis of an impermissible discriminatory criterion. *St. Mary's Honor Ctr.*, 509 U.S. at 519.

Here, for the reasons discussed above regarding Plaintiff's failure to establish a *prima facie* case, the Court holds that no reasonable jury could conclude that Defendant discriminated

against Plaintiff on the basis of his race, color, or national origin. Defendant is therefore entitled to summary judgment on Plaintiff's disparate treatment claims.

### C. Defendant Is Entitled to Judgment as a Matter of Law on Plaintiff's Retaliation Claim

Plaintiff also asserts that he was subject to discrimination because of prior EEO activity. Title VII makes it unlawful for employers to discriminate against an employee because he has filed a charge with the EEOC. 42 U.S.C. § 2000e-3(a). The *McDonnell Douglas* framework also governs Title VII retaliation claims. *Moore v. City of Philadelphia*, 461 F.3d 331, 342 (3d Cir. 2006). If the plaintiff first articulates a *prima facie* case of retaliation, the employer must then come forward with a legitimate, non-retaliatory reason for the discharge. *Id.* (citing *Krouse v. Am. Sterilizer Co.* 126 F.3d 494, 500–01 (3d Cir. 1997)). If the employer produces a legitimate, non-retaliatory reason, the Plaintiff then shoulders the burden of proving that legitimate reason is pretextual, and that retaliation was the true ground for termination. *Krouse*, 126 F.3d at 500–01.

### 1. Plaintiff Has Failed to Establish a *Prima Facie* Case of Retaliation

To establish a *prima facie* case of retaliation, plaintiff must demonstrate: (1) he was engaged in protected activity; (2) the defendant took adverse employment actions against him; and (3) there was a causal connection between the adverse action and his protected activity. *Moore*, 461 F.3d at 340–41.

Here, it is undisputed that Plaintiff's protected activity was his earlier EEO action in 1993, which resulted in him being reinstated to FCI Loretto in January of 1998. The adverse employment actions include revocation of medical privileges, demotion, and termination. The

remaining issue is whether Plaintiff has shown a causal connection between his protected activity and the adverse actions he suffered, as well as his termination.

At the *prima facie* stage, the plaintiff must produce evidence "sufficient to raise the inference that [his] protected activity was the *likely reason* for the adverse [employment] action." *Carvalho-Grevious v. Del. State Univ.*, 851 F.3d 249, 259 (3d Cir. 2017). To establish a causal connection, a plaintiff must show either temporal proximity between the protected activity and the adverse employment action, or ongoing evidence of antagonism. *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 288 (3d Cir. 2001). The timing of an alleged retaliatory action "must be unusually suggestive of retaliatory motive before a causal link will be inferred." *Williams v. Philadelphia Hous. Auth. Police Dep't*, 380 F.3d 751, 760 (3d Cir. 2004). If the temporal proximity is not "unusually suggestive," this Court must determine if the Plaintiff's evidence, "looked at as a whole, is sufficient to raise the inference." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280 (3d Cir. 2000).

Here, Plaintiff cannot establish "unusually suggestive" temporal proximity between the adverse actions taken against him and his protected activity. Plaintiff returned to FCI Loretto approximately five years after filing his complaint with the EEOC. Although he did not return immediately to FCI Loretto after the EEOC claim, Plaintiff has put forth no evidence that shows he was being retaliated against upon his return to FCI Loretto. The Court finds that the five-year gap between the EEOC claim and the adverse employment actions is not "unusually suggestive" of a causal link. *See LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 233 (3d Cir. 2007) ("Although there is no bright line rule as to what constitutes unduly suggestive temporal

proximity, a gap of three months between the protected activity and the adverse action, without more, cannot create an inference of causation and defeat summary judgment.").

Looking at the evidence in this case as a whole, the evidence is not sufficient to raise an inference of causation. Plaintiff has not shown that any of the people responsible for the adverse employment actions against him were doing so to retaliate against Plaintiff because he filed a claim with the EEOC. It is undisputed that Dr. Leonard was the one who revoked Plaintiff's medical privileges and Warden Shearin was the one who reassigned Plaintiff to non-medical tasks and ultimately terminated Plaintiff's employment. Plaintiff has not pointed to any evidence that shows that either Dr. Leonard or Warden Shearin acted to retaliate against Plaintiff. Plaintiff had no conversations with either Dr. Leonard or Warden Shearin in which his EEOC claim was even discussed. Plaintiff's EEOC claim was never mentioned in any of the memoranda that discussed Plaintiff's performance issues at FCI Loretto. Additionally, Plaintiff has not introduced any evidence that Mr. Trimbath—the FCI Loretto employee who was the subject of the allegations in the EEOC claim—displayed any animosity or harassed Plaintiff because Plaintiff filed the prior EEOC claim. Plaintiff asks this Court to infer that because Plaintiff filed a claim with the EEOC and was then later subjected to adverse employment action the two events must be causally related. The Court will not make that inference—it is Plaintiff's burden to identify sources of proof to support his claim. The claim cannot survive summary judgment on bare inferences alone.

The only evidence that Plaintiff has put forth that is related to the prior EEOC claim was Mr. Schanke's comment about "BS Discrimination." This single comment is not enough to raise an inference of retaliation. The comment was made during the Last Chance period after Plaintiff's

medical privileges had been revoked and his termination had already been proposed. There is no evidence that Mr. Schnake took any adverse action against Plaintiff after the comment was made. Moreover, Mr. Schnake's comment did not chill Plaintiff's EEO rights because Plaintiff filed a complaint about this remark with Warden Shearin that same day. Plaintiff will not be able to convince a reasonable jury that this single remark shows that the revocation of his medical privileges, his assignment to non-medical tasks, and his termination were all causally linked to his filing of the EEOC claim.

Accordingly, Plaintiff has failed to establish a *prima facie* case for his retaliation claim under Title VII.

### 2. Defendant Has Put Forth Evidence that Permits a Jury to Find that Plaintiff Was Terminated for Legitimate, Non-discriminatory Reasons

Even assuming that Plaintiff has put forth enough evidence to make out a *prima facie* case, Defendant has put forth evidence that can show the adverse employment actions were taken for non-discriminatory reasons. The standard in assessing whether a defendant has met its burden of production to rebut the prima facie case is the same for retaliation claims as it is for disparate treatment claims. *See Moore*, 461 F.3d at 342. The Court finds that the non-discriminatory reasons asserted by Defendant for why Plaintiff had his medical privileges revoked, why he was assigned non-medical tasks, and why he was terminated also apply to this claim.

### 3. Plaintiff Cannot Show that Defendant's Reasons for Termination Are Pretextual

A plaintiff proceeding under a pretext theory must convince the factfinder that the employer's proffered non-retaliatory explanation was false, and that retaliatory animus was the "*real reason* for the adverse employment action." *Carvalho-Grevious*, 851 F.3d at 258 (quoting

-25-

*Moore*, F.3d at 342). Put another way, the plaintiff must establish that his "protected activity was a but-for cause of the alleged adverse action by the employer." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013). The plaintiff must therefore produce evidence that all of the offered reasons are pretextual, not merely one. *Berezansky v. CNB Bank*, No. 3:17-cv-105, 2019 WL 4750326, at *8 (W.D. Pa. Sept. 30, 2019).

Here, for the reasons discussed above regarding Plaintiff's failure to establish a *prima facie* case, the Court holds that no reasonable jury could conclude that Plaintiff's filing of a claim with the EEOC was a but-for cause of the revocation of his medical privileges, reassignment to non-medical tasks, or termination. Nor could a jury conclude that all of the proffered reasons for the adverse employment actions were pretextual. Defendant is therefore entitled to summary judgment on Plaintiff's retaliation claim.

**VII. Conclusion**

For the forgoing reasons, the Court grants Defendant's Motion for Summary Judgment. An appropriate order follows.

| JOE A. KANNIKAL, | ) | Case No. 3:12-cv-220 |
| | ) | |
| Plaintiff, | ) | JUDGE KIM R. GIBSON |
| | ) | |
| v. | ) | |
| | ) | |
| WILLIAM P. BARR, | ) | |
| Attorney General, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

NOW, this 21st day of October, 2019, upon consideration of Defendant's for Summary Judgment (ECF No. 120), and for the reasons set forth in the accompanying Memorandum Opinion, it is **HEREBY ORDERED** that said Motion is **GRANTED**. Plaintiff's Amended Complaint is dismissed with prejudice.

BY THE COURT:

**KIM R. GIBSON**
**UNITED STATES DISTRICT JUDGE**